**RECORD NO. 14-1114**

## IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

ROBERT L. TOBEY, CPA,

*Plaintiff - Appellant,*

v.

KEITER, STEPHENS, HURST, GARY & SHREAVES,
A Professional Corporation;
2009 AMENDED AND RESTATED RETIREMENT OBLIGATION
PLAN OF KEITER, STEPHENS, HURST, GARY & SHREAVES,
A Professional Corporation,

*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT RICHMOND

### RESPONSE BRIEF OF APPELLEES

Andrew P. Sherrod
Jaime B. Wisegarver
HIRSCHLER FLEISCHER, P.C.
2100 East Cary Street
P.O. Box 500
Richmond, VA 23218
(804) 771-9575
asherrod@hf-law.com
jwisegarver@hf-law.com

*Counsel for Appellees*                                     July 11, 2014

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __14-1114__        Caption: Robert L. Tobey, CPA v. Keiter, Stephens, Hurst, Gary & Shreaves, et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

2009 Amended and Restated Retirement Obligation Plan of Keiter, Stephens, Hurst, Gary & Shreaves,
(name of party/amicus)

a Professional Corporation

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

10/28/2013 SCC                          - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _____      Date: _____ 2/20/14 _____

Counsel for: Appellees _____

## CERTIFICATE OF SERVICE
****************************

I certify that on _____ 2/20/14 _____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

_____          _____ 2/20/14 _____
       (signature)                          (date)

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  __14-1114__          Caption:  __Robert L. Tobey, CPA v. Keiter, Stephens, Hurst, Gary & Shreaves,__et al

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Keiter, Stephens, Hurst, Gary & Shreaves, a Professional Corporation__
(name of party/amicus)

_____

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                              ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____2/20/14_____

Counsel for: Appellees _____

## CERTIFICATE OF SERVICE
****************************

I certify that on _____2/20/14_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____        _____2/20/14_____
(signature)                                  (date)

- 2 -

# **TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURES

TABLE OF AUTHORITIES ...........................................................................iv

INTRODUCTION ........................................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................4

STATEMENT OF THE CASE...........................................................................5

STATEMENT OF THE FACTS ........................................................................7

SUMMARY OF THE ARGUMENT ....................................................................24

ARGUMENT .............................................................................................26

I.    THE DENIAL OF TOBEY'S CLAIM FOR BENEFITS SHOULD BE UPHELD BECAUSE IT COMPORTS WITH THE TERMS OF THE PLAN, WAS REASONABLE, AND WAS SUPPORTED BY SUBSTANTIAL EVIDENCE.....................................................................26

    A.    The Committee's Decision to Deny Tobey's Claim for Benefits must be Evaluated under the "Abuse of Discretion" Standard ..........26

    B.    The Booth Factors Dictate that the Committee's Decision Must be Upheld .......................................................................28

        1.    The Committee's interpretation of the Plan language was reasonable and entitled to deference (Booth Factor 1) .............28

        2.    The denial of Tobey's claim due to his failure to provide timely notice of retirement was fully consistent with the purpose of the Plan (Booth Factor 2)........................................30

3.    The Committee's determination that Tobey rescinded the 2009 Notice was based on substantial evidence (Booth Factor 3) ................................................................................31

4.    The denial of Tobey's Claim resulted from a principled decision-making process by the Committee consistent with ERISA requirements (Booth Factors 5 and 6) .........................35

5.    "Conflict of interest" does not diminish the reasonableness of the Committee's decision (Booth Factor 8) .......................36

    a.    Conflict of interest is not outcome determinative, but simply "a factor" to be considered ...........................37

    b.    Keiter's financial interest did not taint the evaluation of Tobey's claim ............................................................39

    c.    Hall's involvement in the evaluation of Tobey's claim was necessary and appropriate .............................40

    d.    Tobey's allegations of "personal animosity" are overblown ....................................................................41

    e.    Given the substantial evidence supporting the conclusion that Tobey rescinded the 2009 Notice and the paltry evidence to the contrary, the conflict of interest factor cannot possibly serve as a "tiebreaker" in this case .................................................43

C.    The District Court Did Not Err by Granting Summary Judgment to the Keiter Parties without Hearing Additional Evidence ................44

II.    TOBEY'S STATE LAW CLAIMS CONCERNING HIS COMPENSATION AND SHAREHOLDER RIGHTS WERE PROPERLY DISMISSED .............................................................................49

A.    The District Court Lacked Subject Matter Jurisdiction Over Tobey's State Law Breach of Contract Claims Because They Do Not Arise Out of the Same Common Nucleus of Operative Fact as His Claim for Retirement Benefits Under ERISA .........................49

ii

B.    Even if Supplemental Jurisdiction Did Exist Over Counts II-V, the District Court Reasonably Declined to Exercise Jurisdiction Over Them .......................................................................................54

CONCLUSION ............................................................................................55

ORAL ARGUMENT STATEMENT ..........................................................55

CERTIFICATE OF COMPLIANCE .........................................................56

CERTIFICATE OF SERVICE ..................................................................57

# TABLE OF AUTHORITIES

## CASES

*Abatie v. Alta Health & Life Ins. Co.*,
   458 F.3d 955, 965 (9th Cir. 2006) ...................................................45

*Allapattah Services, Inc. v. Exxon Corp.*,
   362 F.3d 739 (11th Cir. 2004) ........................................................49

*Bendixen v. Standard Insurance Co.*,
   185 F.3d 939 (9th Cir. 1999) ..........................................................45

*Berg v. BCS Finance Corp.*,
   372 F. Supp. 2d 1080 (N.D. Ill. 2005)......................................51, 52

*Bernstein v. CapitalCare, Inc.*,
   70 F.3d 783 (4th Cir. 1995) .............................................................45

*Booth v. Walmart Stores Inc. Associates Health & Welfare Plan*,
   201 F.3d 335 (4th Cir. 2006) ...................................................*Passim*

*Brown v. Retirement Committee of Briggs & Stratton Retirement Plan*,
   797 F.2d 521 (7th Cir. 1986) ...........................................................40

*Cargile v. Confederation Life Insurance Grp. Plans*,
   748 F. Supp. 874 (N.D. Ga. 1990)..............................................48, 49

*Carnegie-Mellon University v. Cohill*,
   484 U.S. 343 (1988)..........................................................................55

*Champion v. Black & Decker (U.S.) Inc.*,
   550 F.3d 353 (4th Cir. 2008) ......................................37, 38, 43, 48

*de Nobel v. Vitro Corp.*,
   885 F.2d 1180 (4th Cir. 1989) .........................................................30

*Doe v. Group Hospital & Medical Serv.*,
   3 F.3d 80 (4th Cir. 1993) .................................................................38

*DuPerry v. Life Insurance Co. of N. America*,
    632 F.3d 860 (4th Cir. 2011) ...........................................................38

*ESAB Group, Inc. v. Zurich Insurance PLC*,
    685 F.3d 376 (4th Cir. 2012) ...........................................................49

*Ellis v. Metropolitan Life Insurance Co.*,
    126 F.3d 228 (4th Cir. 1997) ...........................................................26

*Evans v. Eaton Corp.*,
    514 F.3d 315 (4th Cir. 2008) ...........................................27, 28, 45

*Faison v. Donalsonville Hospital, Inc.*,
    2013 WL. 4614610 (M.D. Ga. Aug. 29, 2013) .............................36

*Faulkner v. Columbia Gas Transmission, LLC*,
    2012 WL 589181 (N.D. W. Va. Feb. 22, 2012) ...........................35

*Firestone Tire & Rubber Co. v. Bruch*,
    489 U.S. 101, 111 (1989) .........................................................26, 37

*Groce v. Eli Lilly & Co.*,
    193 F.3d 496 (7th Cir. 1999) ...........................................................54

*Helton v. AT&T Inc.*,
    709 F.3d 343 (4th Cir. 2013) .....................................................46, 47

*Hilton v. UNUM Life Insurance Co. of America*,
    967 F. Supp. 2d 1114 (E.D. Va. 2013) .......................................45, 46

*Janeiro v. Urological Surgery Prof'l Association*,
    457 F.3d 130 (1st Cir. 2006)......................................................42, 43

*Keith v. Fed. Exp. Corp. Long Term Disability Plan*,
    7:09-c 2010 WL 1524373 (W.D. Va. Apr. 15, 2010) ....................45

*Koffman v. Unum Life Insurance Co. of America*,
    2013 W. 3242350 (E.D. Va. June 24, 2013) ..................................46

*Malagrida v. Holland*,
19 F.3d 1429 (4th Cir. 1994) .......................................................................45

*Mason v. Richmond Motor Co., Inc.*,
625 F. Supp. 883 (E.D. Va. 1986) ...............................................................50

*Metropolitan Life Insurance v. Glenn*,
554 U.S. 105 (2008)...............................................................................*Passim*

*Nicol v. Imagematrix, Inc.*,
767 F. Supp. 744 (E.D. Va. 1991) ...............................................................50

*Rule v. R. I. Department of Transport*,
427 A.2d 1305 (R.I. 1981)............................................................................35

*Saah v. Contel Corp.*,
978 F.2d 1256 (4th Cir. 1992) .....................................................................30

*Salomaa v. Honda Long Term Disability Plan*,
642 F.3d 666 (9th Cir. 2011) .......................................................................38

*Shanaghan v. Cahill*,
58 F.3d 106 (4th Cir. 1995) .........................................................................54

*Sinclair v. Director of Division of Employment Sec.*,
17 N.E.2d 164 (Mass. 1954)........................................................................35

*Stewart v. W. Va. Employers' Mutual Insurance Co.*,
2007 WL 4300595 (S.D.W. Va. Dec. 5, 2007) .....................................52, 53

*United Mine Workers v. Gibbs*,
383 U.S. 715 (1966)................................................................................49-51

*United States v. Morales*,
301 F. App'x 293, 295 (4th Cir. 2008) ........................................................47

*Vaughan v. Celanese Americas Corp.*,
339 F. App'x 320 (4th Cir. 2009)................................................................48

*White v. County of Newberry, S.C.*,
  985 F.2d 168 (4th Cir. 1993) ............................................................50

*Wicklander v. Defined Benefit Pension Plan of AGC-International Union of
  Operating Engineers Local 701 Pension Trust Fund*,
  2004 WL 2260609 (D. Or. Oct. 5, 2004) ...................................47, 48

*Wicklander v. Defined Benefit Pension Plan of AGC-International Union of
  Operating Engineers Local 701 Pension Trust Fund*,
  2005 WL 1271633 (D. Or. May 25, 2005)........................................48

## STATUTES

28 U.S.C. § 1367............................................................................................49
28 U.S.C. § 1367(a)........................................................................................49
29 U.S.C. § 1001, *et seq*................................................................................5

## OTHER AUTHORITIES

Restatement (Second) of Trusts § 187 (1959) .........................................39

Defendants-Appellees, Keiter, Stephens, Hurst, Gary & Shreaves, a Professional Corporation ("Keiter") and 2009 Amended and Restated Retirement Obligation Plan of Keiter, Stephens, Hurst, Gary & Shreaves, a Professional Corporation (the "Plan") (collectively, the "Keiter Parties"),  by counsel, hereby submit the following brief in response to the appeal by Plaintiff-Appellant Robert L. Tobey, CPA ("Tobey") of the District Court's Orders of August 13, 2013 and January 7, 2014, respectively granting the Keiter Parties' motion to dismiss and motion for summary judgment.

## <u>INTRODUCTION</u>

For professional service firms like Keiter, succession planning is critical. Clients and their work must be transitioned when partners retire.  To incentivize its retiring partners to provide sufficient notice, Keiter's partners agreed to a term in their retirement plan that ties the amount of a partner's benefit to the length of notice given.  Under the plan, a partner's accrued retirement benefit decreases in percentage amounts if the partner gives less than two years' notice, and is completely eliminated if the partner provides notice of less than six months.

Tobey retired from Keiter on May 21, 2012, only 87 days after providing notice on February 24, 2012.  The plain terms of the plan therefore required a 100% reduction of his retirement benefit.  In an effort to circumvent this result,

Tobey contended that his February 2012 submission merely "confirmed" a previous notice of retirement he had given in May 2009.

After providing two rounds of claim review, with Tobey being represented by counsel at the appeal stage, the five voting members of Keiter's executive committee, who had been delegated the discretionary authority to decide the claim, unanimously determined that Tobey had rescinded his May 2009 notice, thus making his February submission untimely. The committee's decision was based on direct evidence from an eye witness to the withdrawal, as well as on a cavalcade of circumstantial evidence showing that Tobey had chosen not to follow through with his May 2009 threat to retire.

Decades of jurisprudence from the Supreme Court and this Circuit have established that when an ERISA plan grants discretionary authority to make benefit determinations, such decisions are reviewed by courts only to determine whether the plan administrator abused its discretion in denying the claim, based primarily on the record before the administrator at the time. If the administrator's decision is reasonable, it must be upheld, even if the court would have ruled differently on its own. The Supreme Court and this Circuit have also established that the presence of a "conflict of interest" on the part of the administrator in deciding the claim does not create any special burdens of proof, but instead is simply "one factor, among many," that the court must consider.

2

In apparent recognition that he cannot contest the substantial evidence supporting Keiter's determination that he rescinded his May 2009 retirement notice, Tobey focuses on the conflict of interest factor—defying established ERISA law by, in essence, contending that the conflicts he alleges create an *ipso facto* abuse of discretion.   As the District Court held, however, after carefully considering the purported conflicts highlighted by Tobey, because the evidence showing that Tobey rescinded his May 2009 notice substantially outweighs the evidence to the contrary, Keiter's decision was not unreasonably influenced by any conflict of interest and must be upheld.

Likewise, the District Court also properly dismissed Tobey's state law claims against Keiter related to his compensation and shareholder rights, holding that it lacked supplemental jurisdiction over such claims because they did not arise out of a "common nucleus of operative fact" with the ERISA action.  Even if the state claims could be said to meet the supplemental jurisdiction threshold, the District Court reasonably concluded that it would exercise its discretion to decline supplemental jurisdiction because the contract disputes would substantially predominate over the ERISA claim, given the different proof and discovery requirements associated with those claims.

The District Court's rulings were soundly reasoned and correct on all counts, and its orders should be affirmed.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Did the District Court correctly hold that it was reasonable for Keiter's Executive Committee to conclude that Tobey had rescinded his May 6, 2009 retirement notice, thus rendering his subsequent February 24, 2012 notice untimely?

2.    Did the District Court correctly apply the factors set forth in *Booth v. Walmart Stores Inc. Associates Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2006) (the "Booth Factors"), in ruling that Keiter's Executive Committee did not abuse its discretion in denying Tobey's claim?

3.    Did the District Court correctly conclude that the decision by Keiter's Executive Committee was not unreasonably influenced by any conflict of interest, given that the evidence in the administrative record tending to show that Tobey rescinded his May 6, 2009 notice substantially outweighed the evidence to the contrary?

4.    Did the District Court abuse its discretion in determining that additional evidence regarding the conflict of interest factor was not necessary to decide the issue of whether the denial of Tobey's claim was reasonable?

5.    Did the District Court correctly rule that it lacked supplemental jurisdiction over Tobey's state law claims because they did not arise out of a

4

common nucleus of operative fact with his claim for benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq*. ("ERISA")?

6.    Did the District Court abuse its discretion in declining to exercise supplemental jurisdiction over Tobey's state law claims on the grounds that they would substantially predominate over his ERISA claim?

## STATEMENT OF THE CASE

On May 20, 2013, Tobey filed his Complaint against Keiter and the Plan, setting forth five counts. J.A. at 8-35. Count I brought a claim against the Plan and Keiter under Section 502(a)(1)(B) of ERISA for retirement benefits. J.A. at 30-31. Counts II through V were claims against Keiter alone for various breaches of contract under Virginia law related to Tobey's purported rights as an employee and shareholder of Keiter. J.A. at 31-35. In Count II, Tobey contended that Keiter breached a contract with him by failing to pay him in accordance his employment agreements. J.A. at 31-32. Count III alleged that Keiter breached a contract with Tobey by failing to pay him bonuses in certain years or by not paying him bonuses equivalent to other similarly situated shareholders. J.A. at 32. In Count IV, Tobey argued that Keiter breached its obligations to him as a shareholder by failing to include him in the bonus pool, which resulted in his share of the firm's value not increasing on the same basis as other shareholders. J.A. at 33. Finally, in Count V, Tobey stated that he had a right to have his shares of

stock in Keiter redeemed, but that the firm had not redeemed his shares. J.A. at 33-34.

The Keiter Parties moved to dismiss Tobey's state law claims on the grounds that they did not arise from a common nucleus of operative fact with his ERISA claim. J.A. at 36-38. The Keiter Parties further contended that even if supplemental jurisdiction existed over the state law claims, the District Court should nevertheless exercise its discretion to dismiss them because they would substantially predominate over the ERISA claim. The District Court agreed and dismissed Counts II-V by Order entered August 13, 2013. J.A. at 99.

Subsequently, the Parties submitted an agreed briefing order for filing cross-motions for summary judgment. J.A. at 4. On or about October 10, 2013, the Keiter Parties filed the administrative record for Tobey's ERISA claim, without objection or supplementation from Tobey. The Parties then filed cross-motions for summary judgment on Tobey's ERISA benefits claim. J.A. at 113-17. The District Court held that the decision of Keiter's Committee to deny Tobey's claim for benefits was reasonable and therefore entered an order on January 7, 2014, granting summary judgment in favor of the Keiter Parties and denying Tobey's cross-motion. J.A. at 216.

6

## STATEMENT OF THE FACTS

**A.     The Plan and Its Relevant Terms.**

Keiter adopted the Plan, which is an employee benefit plan governed by ERISA, as of January 1, 2009, for the purpose of paying retirement benefits to participating employees.  Joint Appendix ("J.A.") at 220-31.  Keiter pays benefits to Plan participants when they are awarded, according to the terms and conditions of the Plan.  J.A. at 220-25.  Section 6 of the Plan describes the process and conditions for payment of benefits under the Plan.  J.A. at 222-24.  Section 6(b) provides for a reduction in a participant's vested retirement obligation amount in percentage increments when the participant provides less than two years' advance written notice of his intention to terminate service from Keiter, as set forth below:

> If less than two (2) years' advance written notice has been provided to the Corporation, the Vested Retirement Amount payable to the Participant shall be reduced as follows:
>
> | Time of Written Notice Prior to Termination of Service | Reduction Percentage (%) |
> |---|---|
> | 18 to 23 months | 25% |
> | 12 to 17 months | 50% |
> | 6 to 11 months | 75% |
> | Less than 6 months | 100% |

J.A. at 223.

According to Section 11(i) of the Plan, the Plan is administered by Keiter's Board of Directors ("Board") or its delegate.  J.A. at 226.  The Board is given "sole and express discretionary responsibility to interpret the terms of the Plan and to

7

decide factual and other questions relating to the Plan and Plan benefits, including, without limitation, eligibility for, entitlement to, and payment of benefits." *Id*. The Plan further provides that the Board "may appoint one or more persons to act as administrator and delegate its administrative and fiduciary responsibilities to such administrator." *Id*. In Tobey's case, the Board delegated responsibility for administering and determining Tobey's claim to the Board's Executive Committee (the "Committee"). J.A. at 850.

**B.    Tobey Joins Keiter and Participates in the Plan.**

Tobey is an accountant who owned and operated a solo accounting practice in Charlottesville, Virginia, prior to January 1, 2006. J.A. at 446. Keiter is an accounting and consulting firm focused primarily on serving clients in and around the Richmond area. J.A. at 356. Tobey merged his firm into Keiter as of January 1, 2006, at which time he became a shareholder of Keiter, managing its Charlottesville office. J.A. at 446-57. Tobey also became an employee of Keiter and executed a written employment agreement. J.A. at 356-66. Tobey was a participant in the Plan. J.A. at 231.

**C.    Tobey Submits a Retirement Notice under the Plan on May 6, 2009, then Almost Immediately Withdraws It.**

On May 6, 2009, Tobey tendered a letter (the "2009 Notice") to Lewis O. Hall ("Hall"), Keiter's managing partner, in which he notes that "I have mapped out a course of action in response to the Committee's denial of a 2008 bonus,

8

failure to grant my due allocation under the Bylaws and Retirement Allocation Plan and most recently, punitive salary reduction." J.A. at 282-85. In summarizing his "course of action," Tobey's letter stated that he "will allow seven days to work things out with you before calling a Board of Directors meeting to air my significant concerns before all equity partners." J.A. at 282. To that end, Tobey enclosed a draft Notice of Special Meeting of the Board for May 19, 2009, to review his compensation concerns, with an accompanying draft memorandum to the Board outlining Tobey's complaints and his perspective on the history of the merger. J.A. at 286-322.

Tobey ended the 2009 Notice by stating that "[i]n addition to requesting your action on the matters set forth herein, this letter will also serve as notice to the firm pursuant to Section 6 of the Amended and Restated Retirement Obligation Plan . . . that I intend to retire from the firm effective January 1, 2012. I look forward to meeting you and hope to have reason in the future to rescind my retirement notice." J.A. at 284-85. A similar notice of intent to retire was contained in the draft Notice of Special Meeting, along with the following statement: "Please know that I would be delighted to have reason to rescind this notice of retirement, as I have need and desire to work beyond age 58." J.A. at 287.

According to Hall, Tobey verbally withdrew and rescinded the 2009 Notice less than a week after its issuance and instructed Hall not to present the letter to the Committee.  J.A. at 123; 132; 338-40; 479; 851-52; 881

**D.  Tobey Thereafter Proceeds with "Business as Usual," Giving No Indication That He Plans to Retire, and Indeed, Does Not Retire on the Date Given in the 2009 Notice.**

Seven days passed, yet Tobey did not notice the Special Meeting of the Board reflected in the drafts enclosed with the 2009 Notice.  J.A. at 339-40.  Nor did he take any steps in the months thereafter to prepare for a January 1, 2012 retirement, such as transitioning client files or initiating any discussions with Keiter regarding the practical logistics of implementing a retirement.  J.A. at 340-41.  Nor did Tobey actually retire on January 1, 2012, as stated in the 2009 Notice. J.A. at 341.

Instead, during the period between May 2009 and January 2012, the following occurred:

(1)    Tobey signed a new Employment Agreement dated January 1, 2010, but made no mention of an intention to terminate employment effective as of January 1, 2012.  J.A. at 340; 367-78.

(2)    Tobey participated in several partner meetings in 2010 and 2011 during which succession planning and/or the business reasons for the two-year notice requirement under the Plan were discussed.  During certain of these

10

meetings, spreadsheets were circulated listing each partner and their projected date of retirement.  J.A. at 340; 381-94; 409-19.  Tobey's projected date of retirement on those spreadsheets was consistently reflected on the spreadsheets as 2018.  J.A. at 384; 390; 409.  Nevertheless, at no time did Tobey object, attempt to correct the information regarding his retirement date, or refer to the 2009 Notice as being relevant to his retirement schedule.  J.A. at 340.

(3)     Tobey completed a self-evaluation of his goals for the 2010-2011 fiscal year, in which he answered "December 31, 2017" to the questions "At what age do you expect to retire?  What would be the effective date of your retirement?"  J.A. at 395-98; 852.

(4)     Tobey completed a self-evaluation of his goals for the 2011-2012 fiscal year in which he projected a billable-hours goal equal to the previous year's goals.  Tobey further stated that his "client initiatives for 2011-2012 are the same as last year but includes weekly contacts with referral sources.  Still need to get the lunch and learn program started."  J.A. at 395; 399-407.

(5)     At a partner meeting in November 2011, Tobey presented his goals for the 2011-2012 fiscal year.     J.A. at 340; 420-21.  During his presentation, Tobey discussed his efforts to generate new business and his views on prospects for business development in 2012.  J.A. at 340; 421.  During that meeting, Tobey gave no indication that he intended to retire as of January 1, 2012.  J.A. at 340.

11

(6)    Consistent with the goals he expressed in his self-evaluations, Tobey worked to create a new practice group at Keiter.  In a June 21, 2011 email, Tobey described the goal of the group as follows:  "Within two years to be recognized by innovation economy companies and advisors to and investors in these as the 'go to' firm for tax, accounting, and advisory services."  J.A. at 422.

After January 1, 2012, which passed without any mention of an intention to retire, Tobey participated heavily in Keiter's efforts to hire a new tax manager for the Charlottesville office.  J.A. at 341.  Tobey expressed impatience with the speed at which the process was progressing and indicated a desire to make the hire quickly in order to support his practice so that he could achieve his 2012 goals.  *Id.* Throughout the recruiting effort, Tobey never raised the issue of his retirement. *Id.*

## E.    Tobey Gives A Second Retirement Notice on February 24, 2012, Stating His Intent to Retire on April 30, 2012 and Making a Claim for Benefits Under the Plan.

On February 24, 2012, Tobey sent a letter to Hall, in which he enclosed a copy of his May 6, 2009 submission (the "2012 Notice").  J.A. at 280-336.  The 2012 Notice further stated that:  "I hereby confirm my wish to retire from the firm and give notice pursuant to Section 8(b) of my Employment Agreement dated January 1, 2010 that I intend to terminate my employment with Keiter, effective

April 30, 2012." J.A. at 280.[1] The 2012 Notice expressed that he "will expect to receive 100% of [his] vested retirement obligation amount in 120 equal installments commencing June 1, 2012," and requested that Hall "please consider this a claim for benefits . . . ." *Id*.

By letter of March 8, 2012, Hall acknowledged Tobey's February 24 letter, noting that Keiter accepted Tobey's notice of termination, effective April 30, 2012. J.A. at 337-38. Hall further noted Tobey's claim for benefits under the Plan and advised Tobey that he would receive a written decision within the time specified in the Plan. *Id*. Hall stated, however, that "[w]e were quite surprised by your untimely resignation in the heart of tax season, but were shocked that you would make reference to your May 6, 2009 letter in view of the fact that you verbally rescinded that letter within less than a week of its issuance and both you and the firm have based all of our respective actions since that time on that verbal rescission." *Id*. Nevertheless, Hall indicated that the potential impact of the 2009 Notice on Tobey's 2012 Notice would be reviewed. J.A. at 338. Hall made clear, however, that "Keiter's acceptance of [Tobey's] Notice of Termination is not and shall not be deemed an acceptance that the May 6th letter has any impact on your current Notice of Termination to be effective April 30, 2012." *Id.*

---

[1] Tobey actually ended his employment with Keiter on or about May 21, 2012. J.A. at 25-26; 50.

**F.    Tobey's Claim for Benefits is Denied on the Grounds that Tobey's Retirement Benefit was Reduced by 100% Under the Terms of the Plan Because Tobey Gave Less Than Six Months' Notice of His Intent to Terminate Service from Keiter.**

On May 22, 2012, Hall provided Tobey with a letter denying his claim for benefits under the Plan and providing the basis for the decision (the "Initial Denial Letter"). J.A. at 339-47. The Initial Denial Letter explained that "the specific reason for the denial of the Claim is the 100% reduction in [Tobey's] Vested Retirement Obligation Amount pursuant to Section 6(b) of the Plan, resulting from [his] having given less than six (6) months advance written notice of your intention to terminate service from Keiter." J.A. at 339. The Initial Denial Letter stated that "through the February 24th Letter, [Tobey] provided Keiter with only 66 days advance written notice of [his] intent to terminate service from Keiter (from February 24, 2012 through April 30, 2012). Because [Tobey] provided less than 6 months written notice of [his] intent to terminate service from Keiter, pursuant to Section 6(b) of the Plan, [his] Vested Retirement Obligation Amount is reduced by 100%." *Id*.

The Initial Denial Letter further explained that "Keiter has determined that the May 6th Letter has no impact on your current Notice of Termination, given that you explicitly rescinded the May 6[th] letter within days after initially delivering it." *Id*. In support of that determination, the Initial Denial Letter stated as follows:

14

> Specifically, in the discussions you and I had shortly after you sent the May 6th Letter, you orally represented to me that your concerns as stated in the letter had been addressed, and that you were therefore withdrawing the May 6th Letter. To that end, you expressly instructed me not to provide the May 6th Letter to the Executive Committee, because you did not want to trigger the resignation discussions and planning process that would have inevitably followed. In addition, although you initially stated your desire to call a full meeting of the Board to discuss your resignation, after our discussions you elected not to call a Board meeting. In short, in the days following your delivery of the May 6th letter, you indicated, both through your own words and conduct, that your concerns had been addressed, and that you were therefore rescinding the May 6th Letter.

J.A. at 339-40. In addition, Hall noted that "[a]ll of [Tobey's] subsequent conduct after May 2009 was consistent with [his] having rescinded the May 6th Letter and [his] notice of resignation, and at no time did [Tobey] provide Keiter with any indication that [he] still intended to resign effective January 1, 2012." J.A. at 340. To the contrary, "[Tobey's] conduct since May 2009, including [his] recent conduct in late 2011 and early 2012, at all times indicated that [he] intended to remain employed with Keiter for the foreseeable future." *Id*.

The Initial Denial Letter also provided examples of Tobey's conduct supporting the determination that he had rescinded the May 6th notice of termination, including his failure to raise any issue during multiple partner meetings where spreadsheets were circulated showing his projected retirement on a future date beyond January 1, 2012; his presentation at a November 2011 partner meeting regarding his goals for 2012 with no mention of any intention to retire that

15

year; and his failure in the months leading up to January 1, 2012 to make any plans to transition clients or arrange any other retirement logistics with Keiter.  J.A. at 340-41.  The Initial Denial Letter further stated that "perhaps the best confirmation of [Tobey's] rescission of the May 6th Letter is that, contrary to the May 6th Letter, **you did not actually terminate** your service with Keiter effective January 1, 2012.   Instead, January 1, 2012 passed without incident and without any mention from you of an intention to retire, and your conduct and communications with Keiter from January 1, 2012 until the February 24th letter continued to indicate that everything remained 'business as usual.'" *Id.*

## G.    Tobey Appeals the Decision to Deny His Claim for Benefits.

By letter from his counsel dated July 17, 2012, Tobey appealed the denial of his claim for benefits, requested documents, and asked for an extension for submitting complete appeal paperwork until August 31, 2012.  J.A. at 353.  By subsequent letter from his counsel dated July 23, 2012, Tobey noted that he was assembling materials to support his appeal and that, in the meantime, it should be noted that the grounds for his appeal were that (1) he timely and properly provided notice of his intent to retire under the terms of the Plan, (2) at no time did he rescind his intention to retire, and (3) the denial of his claim was based on arbitrary and capricious considerations, including personal animosity.  J.A. at 355.  Tobey subsequently requested and was granted additional time to submit further materials

16

in support of his appeal. J.A. at 758-71. By letters dated August 16 and 27, 2012, Tobey was provided with hundreds of pages of documents relevant to his claim and the May 22 denial. J.A. at 232-716.

By letter of counsel dated September 28, 2012, Tobey provided additional factual information and argument in support of his appeal. J.A. at 777-98; 111-12. The appeal was based on the same three grounds set forth previously in Tobey's July 23, 2012 letter. J.A. at 355; 793.

As to the argument that he gave timely notice under the Plan, Tobey pointed to the 2009 Notice. J.A. at 793-94. According to Tobey, Section 6(b) "sets forth only one discrete requirement in order for a participant to trigger the Plan's payment of his or her full retirement benefit obligation: 'provid[ing] to the Corporation not less than two years advance written notice of his *intention* to terminate service from the Corporation.'" J.A. at 793. Tobey contended that "[n]o follow-up activity is required under this language, nor must any action by the Board or the Corporation be taken to confirm, accept or acknowledge the participant's claim" and, indeed, "the Plan does not even require participants to actually retire according to his or her expressed intentions." *Id*. By Tobey's rationale, a "simple, one-time written statement of the participant's intention to retire is sufficient, coupled, of course, with the participant's actual retirement at least two years after the delivery of such advance written notice." *Id*.

17

Tobey addressed the statements in the Initial Denial Letter that he had rescinded his retirement notice and instructed Hall not to provide the May 6, 2009 letter to the Committee by stating that "[n]one of these statements is true." J.A. at 794. Instead, Tobey argued that he in no way rescinded his retirement notice during his discussions with Hall. *Id*. According to Tobey, when he presented Hall with the May 6, 2009 letter, Hall became hostile and said "words to the effect of 'How could you do this to me?' and 'I can't show this to the Executive Committee because they are going to say "Let's Fuck Him . . . ."'" *Id*. Tobey also contended that a lack of rescission was evidenced by the fact that Hall did not return the May 6, 2009 letter to him and did not send a letter or other communication to Tobey indicating that the notice had been rescinded. J.A. at 795.

Tobey further posited that the host of facts presented in the Initial Denial Letter to support the view that Tobey had withdrawn his retirement notice were "of no consequence at all" and, instead, created an obligation on Tobey to "repeatedly emphasize his notice over and over," which was not contained in the Plan. J.A. at 795-96. Tobey submitted a sworn declaration setting forth his version of the discussion with Hall following his submission of the May 6, 2009 letter, as well as reciting his various complaints regarding his treatment as an employee and shareholder in the firm. J.A. at 780-92. Tobey also submitted a declaration of a former colleague, Rick White. J.A. at 111-12.

18

Tobey argued that the decision to deny his benefits was tainted by a conflict of interest. According to Tobey, a financial conflict of interest was present because "Keiter both funds and administrates the Plan." J.A. at 796. Tobey also contended that notes by Hall regarding "options" for dealing with Tobey's claim, one of which was a potential "buy out" of Tobey, suggested that Keiter was "trying to find a way to avoid its significant binding retirement obligation in order to save money." J.A. at 473; 797. Tobey further argued that the denial of his benefits claim was also motivated by personal animosity toward him, as indicated by an email sent by Keiter's Chief Operating Officer ("COO"), saying "Game on Bitches" after the decision was made to deny Tobey's claim. J.A. at 798. Tobey also cited the drafts of the denial letter, which he portrayed as setting forth "increasingly aggressive" language towards Tobey. *Id.*

## H.   The Decision to Deny Tobey's Claim is Upheld.

Following receipt of Tobey's appeal, Hall reviewed Tobey's various assertions set forth in his Declaration and wrote out notes addressing and refuting Tobey's allegations, which he shared with the Committee. J.A. at 880-84. On the issue of Tobey's rescission of the 2009 Notice and Tobey's statement that he never instructed Hall not to provide his letter to the Committee, Hall's notes state that "Robert absolutely told me not to submit the documents to the EC." J.A. at 881. On November 6, 2012, the Committee met to reconsider the denial of Tobey's

benefits claim based on Tobey's appeal.  J.A. at 878.  After discussion of Tobey's appeal submission and looking at all the documents again, the Committee voted unanimously to deny Tobey's claim.  *Id*.

On November 14, 2012, Hall wrote to Tobey affirming the denial and stating the Committee's reasons for its decision (the "Appeal Denial Letter").  J.A. at 850-54.  The Appeal Denial Letter also set forth the Committee's reason for disagreeing with Tobey's interpretation of Section 6(b) regarding the nexus between the giving of the two year notice and actual retirement.  J.A. at 851.  As noted, "according to [Tobey's counsel's] letter, 'a simple, one-time written statement of the participant's *intention* to retire is sufficient' for purposes of Section 6(b), regardless of when the participant *actually* retires.'"  *Id*.  The Appeal Denial Letter explained that "if that interpretation of the notice requirement were correct, every participant would have been able to satisfy the notice requirement immediately after executing the Plan agreement, simply by giving a notice of an intent to retire 'someday' more than two years in the future.  Such an interpretation would lead to absurd results, and is not consistent with the letter or intent of Section 6(b) of the Plan."  *Id*.

As summarized in the Appeal Denial Letter, "the primary basis for [Tobey's] appeal is his contention that his letter dated May 6, 2009 (the "2009 Letter") constituted proper notice of his intent to retire for purposes of Section 6(b)

20

of the Plan, and his insistence that he did not rescind the 2009 Letter." J.A. at 851. The Appeal Denial Letter commented, however, that, "after a full review of this claim . . . the Executive Committee continues to believe that [Tobey] did in fact rescind the 2009 Letter." *Id.*

The Appeal Denial Letter further noted that "the Executive Committee has reviewed and considered the allegations in your letter and in [Tobey's] Declaration dated September 28, 2012 (the "Declaration"), [and] the Executive Committee rejects [Tobey's] version of the events immediately following his submission of the 2009 Letter." *Id.* The Appeal Denial Letter explained as follows:

> As an initial matter, the Executive Committee has reviewed but disagrees with many of the assertions set forth in the Declaration. However, the Executive Committee finds that many, if not most, of the assertions set forth in the Declaration have no bearing on [Tobey's] appeal of the denial of his claim for benefits under the Plan. With respect to the portions of the Declaration that do bear on [Tobey's] claim under the Plan, the Executive Committee explicitly rejects [Tobey's] assertion that I stated to him that the Executive Committee would "say 'Let's Fuck him'" if presented with the 2009 Letter. At no time did I make any such statement to [Tobey]. I did caution [Tobey] that the Executive Committee would in all likelihood accept his resignation if tendered, and that he should therefore be very sure that that was what he wanted to do. More importantly, however, the Executive Committee rejects [Tobey's] contention that I – and not [Tobey] -- decided not to provide the full Executive Committee with the 2009 Letter. To the contrary, [Tobey] explicitly and unequivocally instructed me not to submit the 2009 Letter to the full Executive Committee. [Tobey's] claim that he never instructed me to do so is simply false.
>
> As was stated in the original Denial Letter, following [Tobey's] submission of the 2009 Letter, [Tobey] and I met to discuss his

21

concerns as outlined in the 2009 Letter. As a result of those discussions, [Tobey] represented to me that his concerns had been addressed, and that he no longer wished to tender a notice of intent to retire per the 2009 Letter. In short, after his concerns were addressed, [Tobey] decided to withdraw the 2009 Letter by instructing me not to present it to the Executive Committee. [Tobey] seems to have contemplated this very outcome (i.e., rescinding the 2009 Letter) even as he submitted the 2009 Letter. As your own letter notes, the 2009 Letter closes with the statement "I look forward to meeting you and *hope to have reason in the future to rescind my retirement notice.*" (emphasis added). Once [Tobey's] concerns had been addressed through our discussions, it is apparent that he had found a "reason to rescind" the 2009 Letter, as that is precisely what he did.

J.A. at 851-52.

The Appeal Denial Letter then explained the Committee's consideration of

Tobey's arguments regarding his post-2009 conduct:

The Executive Committee has considered, but does not agree with, your assertion that a review of [Tobey's] post-2009 conduct is intended to impose additional eligibility requirements on [Tobey] outside the provisions of the Plan. Your letter is correct in stating that the only eligibility requirement at issue is the requirement to give proper notice of retirement under Section 6(b) of the Plan. However, given that [Tobey] now takes the position that he did not rescind the 2009 Letter, the Executive Committee disagrees with your assertion that the facts pertaining to [Tobey's] post-2009 conduct "are of no consequence at all." To the contrary, the Executive Committee believes a review of [Tobey's] post-2009 conduct supports the Executive Committee's conclusion that [Tobey] did in fact rescind the 2009 Letter as noted above, given that, at all times after May 2009, he acted in a manner consistent with his having rescinded the 2009 Letter.

Without reiterating all of the facts set forth in the original Denial Letter, the Executive Committee finds that [Tobey's] conduct after May 2009 supports the conclusion that [Tobey] did rescind the 2009 Letter shortly after he submitted it, and that at all times thereafter he

22

operated in accordance with his having done so.  As noted in the Denial Letter, at no time after May 2009 did [Tobey]  take <u>any</u> action that would have been consistent with his having given a 2-year notice of retirement.…

*\*\**

In short, the Executive Committee believes that no reasonable person would have conducted themselves as [Tobey] did after 2009 if they had <u>not</u> rescinded the 2009 Letter.…

J.A. at 852-53.

The Appeal Denial Letter also explained that the Committee had considered but disagreed with Tobey's contention that its decision-making process was tainted by conflict of interest.  J.A. at 852.  The Committee specifically rebuffed Tobey's effort to create a perception of conflict of interest on the grounds that Keiter was considering whether to "buy out" Tobey.  As stated in the Appeal Denial Letter:

The evaluation of a settlement option is in no way indicative that Keiter believed that [Tobey] is owed the amounts he now claims under the Plan.  Any consideration of a "buy out" of [Tobey] was strictly for purposes of exploring whether a structured resolution with [Tobey] (which would include other open issues between the parties, not merely limited to the Plan) would make sense if there were to be a prolonged dispute with [Tobey] over his claim.

J.A. at 853.

In addition, the Appeal Denial Letter explained that the Committee had considered and rejected Tobey's argument that personal animosity played a role in the decision to deny his claim, noting as follows:

The email from [Keiter's COO] upon which you attempt to rely to show bias was sent <u>after</u> the decision to deny [Tobey's] claim had already been made.  Moreover, [the COO] is not even a shareholder of

23

Keiter, and therefore does not sit on the Board or the Executive Committee, and had no vote whatsoever with respect to any determinations regarding [Tobey's] claim under the Plan. As the Chief Operating Officer for Keiter, the bulk of the administrative burden caused by [Tobey's] resignation during Keiter's busiest season of the year was going to fall on [the COO]. Given that the two year notice requirement under the Plan was intended to avoid just such a scenario, [the COO's] e-mail is merely evidence of the level of frustration about the situation in general, and not an indication that personal animosity played any role in Keiter's consideration of [Tobey's] claim under the Plan. Further, although Keiter does not disagree that [Tobey] sometimes struggled to maintain positive social relationships with some of his partners and co-workers at Keiter – and has further strained those relationships by making veiled threats of unfounded claims as set forth in your July 17, 2012 letter – none of those issues have had any impact whatsoever on the Executive Committee's decision-making process in evaluating the merits of [Tobey's] claim under the Plan.

J.A. at 853-54.

## **SUMMARY OF THE ARGUMENT**

As the District Court aptly stated, Tobey's ERISA case "hinge[s] on whether the Keiter Executive Committee abused its discretion in denying [his] benefits claim, specifically in determining whether Tobey withdrew the 2009 letter stating his intention to retire." J.A. at 95. It is evident that the Committee did no such thing. To the contrary, the record reveals that the Committee's decision was unquestionably reasonable—and, indeed, correct.

The Plan states plainly that a participant's retirement benefit amount is reduced by 100% if he provides less than six months' notice. Tobey provided only

24

87 days' notice.  To avoid the resulting 100% reduction in his retirement benefit, Tobey contended that the 2012 Notice only "confirmed" the 2009 Notice.

Tobey's argument was rejected, however, as the Committee determined—based on a plethora of evidence—that Tobey had withdrawn the 2009 Notice within a week of its issuance.  In a nutshell, Tobey told Hall that he was withdrawing the 2009 Notice and not to share it with the Committee, and then Tobey proceeded to take absolutely no steps between May 2009 and February 2012 that would have been consistent with what any reasonable person expecting to retire would have done.

In holding that the Committee acted reasonably in denying Tobey's claim for benefits in light of such evidence, the District Court properly evaluated the Booth Factors established by this Court.  The District Court also correctly applied the Supreme Court's decision in *Metro. Life Ins. v. Glenn*, 554 U.S. 105 (2008), by assessing Keiter's conflict of interest as "a factor," but ultimately concluding that the substantial evidence in the record supporting the Committee's conclusion confirmed that such conflict did not improperly influence the decision.  The District Court's granting of summary judgment in favor of the Keiter Parties, without an additional evidentiary hearing, was also consistent with decisions of this Court and other district courts within this Circuit.

The District Court also properly dismissed Tobey's state law counts, holding that they did not arise out of a common nucleus of operative fact with his ERISA clam so as to create supplemental jurisdiction and that, even if they did, such jurisdiction would be declined because the state law claims substantially predominate over the ERISA claim. The District Court's decision that supplemental jurisdiction did not exist was correct, and it was in no way an abuse of the District Court's discretion to have declined to exercise jurisdiction, if indeed it existed at all.

## ARGUMENT

I. **THE DENIAL OF TOBEY'S CLAIM FOR BENEFITS SHOULD BE UPHELD BECAUSE IT COMPORTS WITH THE TERMS OF THE PLAN, WAS REASONABLE, AND WAS SUPPORTED BY SUBSTANTIAL EVIDENCE.**

### A. The Committee's Decision to Deny Tobey's Claim for Benefits must be Evaluated under the "Abuse of Discretion" Standard.

In ERISA benefits cases where the plan "grants the administrator or fiduciary discretionary authority to determine eligibility or to construe the terms of the plan, the denial decision must be reviewed for abuse of discretion." *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). "Thus, a trustee's discretionary decision will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." *Booth*, 201 F.3d at 341 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)).

26

"[A]n administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Evans v. Eaton Corp.*, 514 F.3d 315, 322 (4th Cir. 2008) (internal quotation omitted). In *Booth*, this Court analyzed factors for reasonableness and stated that

> a court may consider, but is not limited to, such factors as: (1) the language of the plan; (2) the purpose and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d at 342-43.

It is undisputed that the abuse of discretion standard applies to review of Tobey's ERISA claim. Thus, the dispositive issue is whether it was reasonable for the Committee to have determined that Tobey rescinded the 2009 Notice, therefore making the 2012 Notice untimely and resulting in a 100% reduction of his benefit under the Plan.

The Keiter Parties would prevail even under a de novo standard of review because the Committee's decision was correct. Under the abuse of discretion standard, however, judgment for the Keiter Parties was unquestionably appropriate. As well-put by this Court in *Evans*:

27

Under no formulation, however, may a court, faced with discretionary language like that in the plan instrument in this case, forget its duty of deference and its secondary rather than primary role in determining a claimant's right to benefits. The abuse of discretion standard in ERISA cases protects important values: the plan administrator's greater experience and familiarity with plan terms and provisions; the enhanced prospects of achieving consistent application of those terms and provisions that results; the desire of those who establish ERISA plans to preserve at least some role in their administration; and the importance of ensuring that funds which are not unlimited go to those who, according to the terms of the plan, are truly deserving. . . . Thus, the language of discretion in an ERISA plan is a message to courts, counseling not judicial abdication, to be sure, but a healthy measure of judicial restraint.

514 F.3d at 323 (citations omitted).

## B.    The Booth Factors Dictate that the Committee's Decision Must be Upheld.

The District Court's ruling must be affirmed because the Committee's decision to deny Tobey's clam was a reasonable application of the language of the Plan, derived from a deliberate, principled reasoning process, and based on substantial evidence, as reflected in the administrative record. *See Booth*, 201 F.3d at 342-43; *Evans*, 514 F.3d at 322-23.[2]

### 1.    The Committee's interpretation of the Plan language was reasonable and entitled to deference (Booth Factor 1).

According to Section 6(b) of the Plan, if "less than two (2) years' advance written notice [of intention to retire] has been provided to the Corporation, the

---

[2] As noted by the District Court, the parties appear to agree that Booth Factors 4 and 7 are not applicable and carry no particular weight. J.A. at 210.

28

Vested Retirement Obligation Amount payable to the Participant shall be reduced as follows:  Time of Written Notice Prior to Termination . . . Less than 6 months – 100%."  J.A. at 221.  Here, Tobey's notice of retirement was submitted February 24, 2012, with a termination date of April 30, 2012, a mere 66 days in advance.  J.A. at 280.  Thus, under the plain terms of the Plan, because Tobey gave less than six months' notice of his intention to retire on April 30 (and of his actual retirement May 21), Tobey's vested retirement obligation amount was reduced by 100% and no benefits are payable.

Tobey wrongly contends that the Committee misinterpreted the Plan terms, urging that "[a]ll that is required is a least two years' prior written notice be given prior to ceasing service with the Firm."  Appellant's Br. at 47.  According to this rationale, no follow-up is required, and the participant does not even need to actually retire according to his initially expressed intentions, but instead simply needs to retire at some point at least two years thereafter.  *Id.* at 47-48.  Under Tobey's logic, simply issuing the 2009 Notice sufficed to meet the Plan's requirements since he eventually retired more than two years later.

The Committee considered Tobey's novel interpretation of the Plan, but understandably disagreed and rejected it.  As the  Committee explained, "if that interpretation of the notice requirement were correct, every participant would have been able to satisfy the notice requirement immediately after executing the Plan

29

agreement, simply by giving a notice of an intent to retire 'someday' more than two years in the future. Such an interpretation would lead to absurd results, and is not consistent with the letter or intent of Section 6(b) of the Plan." J.A. at 851.

The Committee's interpretation of the Plan is entitled to substantial deference. Regarding a plan administrator's interpretation of the plan, this Court has stated that "the dispositive principle is whether the plan administrator has offered a reasonable interpretation of plan provisions." *Saah v. Contel Corp.*, 978 F.2d 1256, at *3 (4th Cir. 1992) (citing *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir. 1989)). Here, the Committee's interpretation of the Plan is the <u>only</u> reasonable interpretation. If all that were required was a one-time written statement of the participant's intention to retire at least two years before actual retirement, as Tobey argues, then all Plan participants would provide notice of their intent to retire immediately after joining the Plan. This interpretation would make no sense and was properly rejected by the Committee and the District Court.

### 2. The denial of Tobey's claim due to his failure to provide timely notice of retirement was fully consistent with the purpose of the Plan (Booth Factor 2).

Tobey posits incorrectly that the denial of his claim conflicts with the purpose of the Plan. The false premise upon which this argument is based is that the purpose of the Plan was somehow to exchange Tobey's "book of business" for a retirement benefit. Appellant's Br. at 50. A plain reading of the Plan--previous

iterations of which pre-date Tobey's affiliation with the Plan by many years--show that the purpose of the Plan is actually to pay retirement benefits to participating shareholders, pursuant to the Plan terms.  J.A. at 220-31.  As the District Court rightly noted, it is also evident that the purpose of the notice provision contained in Section 6(b) of the Plan is to incentivize participants to provide ample warning of their termination of service so that Keiter can engage in appropriate transition planning.  J.A. at 223; 853.  Thus, the application of Section 6(b) of the Plan by the Committee furthered, rather than contradicted, the purpose of the Plan.

### 3. The Committee's determination that Tobey rescinded the 2009 Notice was based on substantial evidence (Booth Factor 3).

As Tobey admits, his claim can only be timely if his 2009 Notice were effective.  The Committee reasonably rejected that contention, however, based on the substantial evidence that Tobey had rescinded and withdrawn the 2009 Notice shortly after it was issued.

As an initial matter, Hall, a member of the Committee, was the person to whom Tobey submitted his 2009 Notice.  According to Hall, after he met with Tobey to discuss the concerns raised in the letter, Tobey was satisfied and verbally rescinded the notice and told Hall not to give it to the Committee.  J.A. at 123; 339; 479; 851-52; 881.  Hall's recollection of these events is itself sufficient evidence to support the reasonableness of the decision, but the Committee further relied on a

31

multitude of objective evidence of Tobey's behavior following May 2009, all of which the Committee reasonably concluded was contrary to how any reasonable person would have behaved had he truly intended to retire January 1, 2012. J.A. at 339-42; 850-54.

　　　To recap, Tobey's actions (or inactions) included:

- Failing to notice the shareholder meeting according to the drafts appended to the 2009 Notice.

- Signing a new Employment Agreement in 2010, making no mention of an intention to terminate employment effective as of January 1, 2012.

- Participating in several partner meetings in 2010 and 2011 during which spreadsheets were circulated listing each partner and their projected date of retirement, but never objecting to or attempting to correct the consistent notation of his own retirement date as **2018**.

- Completing a self-evaluation of his goals for the 2011-2012 fiscal year (continuing well after January 1, 2012) in which he projected a billable-hours goal equal to the previous year's goals, which could only be achieved with a full years' work, and affirming that his "client initiatives for 2011-2012 are the same as last year but includes weekly contacts with referral sources…"

32

- Presenting his goals for 2011-2012 during a November 2011 Partners' meeting where he discussed his efforts to generate new business and prospects for business development in 2012.

- Creating a new practice group, which, according to an e-mail Tobey sent on June 21, 2011, had a **two-year** goal.

J.A. at 339-40; 367-422.

And as if all this were not enough, on Tobey's completed self-evaluation of his goals for the 2010-2011 fiscal year, Tobey answered "**December 31, 2017**" to the questions "At what age do you expect to retire? What would be the effective date of your retirement?"  J.A. at 397 (emphasis added).

The evidence in support of rescission was also bolstered by Tobey's failure to take any of the steps related to client transition and administrative logistics that one would logically and reasonably conclude would be taken if one were retiring on January 1, 2012.  J.A. at 340-41.  Tobey's lack of planning for retirement culminated, of course, with his failure to **actually retire** on January 1, 2012 as indicated in the 2009 Notice.  J.A. at 341.  In sum, Tobey did **none** of the things that would reasonably be expected of one planning to retire in accordance with the 2009 Notice.  Given this evidence, the Committee reasonably and properly rejected

33

Tobey's version of events and his statement that he never rescinded the 2009 Notice.

In discussing the disagreement between Hall and Tobey over whether Tobey asked Hall not to show the 2009 Notice to the Committee, Tobey contends that Tobey's declaration, which was provided under oath, is entitled to more weight than Hall's memorandum, which was not prepared under oath. Appellant's Br. at 52. Section 11(i) of the Plan, however, expressly provides the discretionary authority to resolve factual questions such as the one posed by Tobey. J.A. at 226. ERISA jurisprudence is also clear that a plan administrator with discretionary authority has the power to weigh the strength and credibility of the evidence before it and is not bound by evidentiary rules in so doing. As noted by the United States District Court for the Northern District of West Virginia:

> [T]he Federal Rules of Evidence "do not apply to an ERISA administrator's benefits determination, and [this Court] review[s] the entire administrative record, including hearsay evidence relied upon by the administrator." … Included in this principle is that, the committee, in its discretionary capacity, can choose to give whatever weight it deems appropriate to every piece of evidence before it. Because another would have given certain evidence more or less weight is irrelevant. It does not appear from the record here that the committee's discretion in this regard was abused.
>
> Finally, this plaintiff cannot show that this committee was biased or conflicted simply by arguing that the decisions made were not favorable to the plaintiff or that the committee gave more weight to evidence submitted by his employer than to his own statements.

*Faulkner v. Columbia Gas Transmission, LLC*, 2012 WL 589181, at *5 (N.D. W. Va. Feb. 22, 2012) (internal citation omitted). The rationale of *Faulkner* applies equally here, and Tobey's argument that his sworn statement trumps the administrative record is misplaced.[3]

### 4. The denial of Tobey's Claim resulted from a principled decision-making process by the Committee consistent with ERISA requirements (Booth Factors 5 and 6).

Tobey submits that the outcome of his claim was "foreordained" because Keiter had already decided to deny his claim even before analyzing the merits. Appellant's Br. at 50. The record illustrates that this accusation has no merit. As the District Court concluded, nothing in the record indicates that the Committee made its decision prior to considering the merits of Tobey's claim. J.A. at 211; *see also, e.g.,* J.A. at 850-54 (discussing the review process on appeal); 882 (Hall refuting the statements attributed to Rick White in Tobey's declaration). To the contrary, the record reflects that Tobey was afforded multiple levels of review of his claim and all of his arguments and evidence were considered. Far from being

---

[3] *Rule v. R. I. Dep't of Transp.*, 427 A.2d 1305 (R.I. 1981) and *Sinclair v. Dir. of Div. of Employment Sec.*, 117 N.E.2d 164 (Mass. 1954), cited for the proposition that hearsay evidence, by itself, cannot form the basis for an administrative determination, also do not help Tobey's cause. Neither of these cases offer any insight into how the Court should weigh Hall's evidence against Tobey's evidence. Tobey's declaration, as well as Hall's memorandum would <u>both</u> be considered hearsay. The fact that Tobey's declaration is sworn does not make it non-hearsay.

35

unprincipled, Tobey received a thorough and reasonable process that met all requirements of ERISA.

Tobey cites *Faison v. Donalsonville Hosp., Inc.*, 2013 WL 4614610 (M.D. Ga. Aug. 29, 2013), but that foreign case is inapposite. Importantly, in *Faison*, the discussion regarding "culpable conduct" arose in the context of whether the plaintiff was entitled to attorneys' fees. *Id.* at *3. The *Faison* court's consideration of the degree of the hospital's culpability or bad faith was one of five factors used by the court to evaluate the motion for attorneys' fees. *Id.* at *3-4. The court ultimately found that the hospital was culpable in its conduct because the benefits committee had denied Faison's appeal without even considering the evidence. *Id.* at *3. Further, two members of the three-member committee had relied almost entirely on the third to make the Committee's decision. *Id.* Thus, *Faison* is both procedurally and factually distinct from this case. Here, the record demonstrates that the five voting Committee members fully reviewed Tobey's claim before denying it, and there is no evidence that any Committee member was improperly influenced by any other member in deciding the outcome.

### 5. "Conflict of interest" does not diminish the reasonableness of the Committee's decision (Booth Factor 8).

Given the substantial evidence in the administrative record supporting the Committee's decision to deny Tobey's claim under the Plan, the weight to be given any conflict of interest is *de minimis*.

36

### a. Conflict of interest is not outcome determinative, but simply "a factor" to be considered.

In *Glenn*, the Supreme Court held that that the conflict of interest present when a plan administrator both evaluates claims and pays benefits under a plan should be weighed as "a factor" in reviewing whether the administrator abused its discretion. According to *Glenn*:

> We believe that *Firestone* means what the word "factor" implies, namely, that when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one. . . .
>
> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance.

554 U.S. at 117. The presence of a conflict of interest does not lead to "special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." *Id.* at 106. Following *Glenn*, this Court has explained it no longer applies a modified or hybrid abuse-of-discretion and that "courts are to apply simply the abuse-of-discretion standard for reviewing discretionary determinations by the administrator, *even if the administrator acted under a conflict of interest*." *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 359 (4th Cir. 2008) (emphasis added). In this Circuit, there is no higher degree of skepticism applied to the review of conflict of interest transactions, but

37

instead the reasonableness test is applied, with "any conflict of interest considered as one factor, among many." *Id.*[4]

Tobey essentially contends that, if his evidence of conflict of interest is accepted, the Committee necessarily abused its discretion. Appellant's Br. at 41-45. To conclude that the presence of a conflict of interest *ipso facto* results in an abuse of discretion, however, is to ignore the holdings in *Glenn* and *Champion* and to distort the standard of review.

Tobey's citation of the Restatement of Trusts to support his theory that a conflict of interest should vitiate the deference afforded to an plan administrator also fails in the face of established ERISA precedent. Courts have acknowledged that the work of an ERISA plan administrator is comparable to that of a trustee in

---

[4] Tobey cites to *Doe v. Group Hosp. & Med. Serv.*, 3 F.3d 80 (4th Cir. 1993), and *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011), in support of his erroneous contention that the mere presence of a conflict of interest justifies a more stringent standard of review. Appellant's Br. at 38; 42. Such mandatory heightened scrutiny is not the law of this Circuit after *Glenn* and *Champion*. Tobey also cites to *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860 (4th Cir. 2011) for the proposition that the court must review the plan administrator's actions "skeptically" when there is a conflict of interest. Appellant's Br. at 46. The *DuPerry* opinion does not support Tobey's argument that "skepticism is the lens through which all of Keiter's actions related to Tobey's claim must be viewed." *Id.* Rather, *DuPerry* simply discusses the pre-*Glenn* standard in the Fourth Circuit, when the court did afford less deference to the administrator's decision in the face of a conflict of interest. *DuPerry*, 632 F.3d at 869. As the *DuPerry* court explains, that standard has since changed. The presence of a conflict of interest "does not alter the applicable standard of review[.]" *Id.*

that "trust law and administrative law ask judges to determine lawfulness by taking account several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 554 U.S. at 106. In the context of a trust, "[w]here discretion is conferred upon the trustee with respect to the exercise of power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion." Restatement (Second) of Trusts § 187 (1959). As noted by the Supreme Court in *Glenn*, however, "[t]rust law continues to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee, while at the same time requiring the reviewing judge to take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." 554 U.S. at 115.

### b.    Keiter's financial interests did not taint the evaluation of Tobey's claim.

While it is acknowledged that Keiter funds the benefits under the Plan and so a conflict is technically present, this factor does not come close to approaching "tie-breaker" status under the circumstances of this case.[5] In addition, Hall's notes about possible "options" for addressing Tobey's complaints that included a potential "buy out" are no more reflective of a desire to avoid a legitimate

---

[5] Indeed, the concepts of self-funding of the Plan and the designation of the Board or its delegate to administer claims are engrained in the language of Plan itself and were acknowledged by all shareholders (including Tobey) by virtue of their signing the Plan and agreeing to participate. J.A. at 220-31.

obligation to Tobey than they are a desire to avoid the cost and distraction of a lengthy legal dispute.

### c.    Hall's involvement in the evaluation of Tobey's claim was necessary and appropriate.

Tobey claims that Hall's involvement in the decision-making as a member of the Committee somehow tainted the process.  Appellant's Br. at 33.  Tobey cites no authority for this proposition, however, and the argument fails as a matter of law and the administrative record.

Neither the Plan nor ERISA required Hall's exclusion from the process.  *See Brown v. Ret. Comm. of Briggs & Stratton Ret. Plan*, 797 F.2d 521, 534-35 (7th Cir. 1986) (holding that the fact that the pension plan retirement committee reviewed its own decision denying benefits did not mean that the claimant did not have a meaningful appeal within ERISA).  Furthermore, nothing in the record reveals any bias on the part of Hall or efforts on his part to influence the rest of the Committee in any improper way.  To the contrary, as a member of the Committee and a person with knowledge of Tobey's allegations, it was only natural for Hall to participate.  Whether as a witness or as part of the Committee, Hall's perspective was relevant, and the other Committee members were entitled to judge Hall's credibility against Tobey's.  Furthermore, any perceived conflict by virtue of Hall's participation was diffused by the participation of the five other voting

Committee members who provided input throughout the process, and the decision was ultimately put to unanimous vote. *See, e.g.,* J.A. 528; 531-35; 543-71; 878.

> **d.    Tobey's allegations of "personal animosity" are overblown.**

Tobey also wrongly contends that the decision to deny his claim was tainted by personal animosity. For this proposition, Tobey points primarily to an email by Keiter's COO. J.A. at 529. As explained by the Committee, however, (1) the COO's "Game on Bitches" email was sent to one other Committee member after the decision to deny Tobey's claims had already been made; (2) the COO is not a shareholder and thus does not have a vote on whether to grant or deny Tobey's claim; and (3) the COO's comment was indicative of her frustration as the one who bore the brunt of the administrative burden caused by Tobey's untimely notice of retirement in the midst of tax season, as opposed to reflecting personal animosity affecting the benefits determination. J.A. at 853.

Tobey also emphasizes a later email from the COO concerning whether Tobey had submitted his appeal papers by the extended deadline, *see* Appellant's Br. at 51, but mischaracterizes the exchange as conveying animosity rather than hope that the dispute might have come to an end. (It should be noted that, at this point, Tobey's counsel had already threated suit.) *See* J.A. 800; *see also* J.A. 354 (litigation hold demand from Tobey's counsel).

41

Similarly, Tobey strains to portray Committee member Carroll Hurst as showing animosity towards him by virtue of purportedly having advocated for better terms for Keiter prior to the 2006 merger and for describing Tobey's contention that he did not withdraw the 2009 Notice as "disingenuous." Appellant's Br. at 44. Of course, there is nothing improper about advocating for better terms in a business deal, and the term "disingenuous" is a reasonable description of Tobey's claim by someone who had observed him take absolutely no steps between 2009 and 2012 that would have been consistent with having maintained the 2009 Notice. J.A. at 561 (email from Hurst commenting on denial letter and noting that Tobey "never uttered a word about his retirement" during discussions about the important business reasons for the Plan's notice provision).[6]

Tobey argues that Keiter's "transparent hostility" undermined the Committee's decision. Appellant's Br. at 45-46. For this proposition, Tobey cites to *Janeiro v. Urological Surgery Prof'l Ass'n.*, 457 F.3d 130 (1st Cir. 2006), a case in which a former participant brought breach of fiduciary duty and benefits claims against the ERISA retirement plan, the plan administrator, and the primary trustee. In *Janeiro*, the court held that the plan administrator was operating under a conflict

---

[6] Tobey also attempts to draw support for his animosity argument from two emails by Bob Keiter. Appellant's Br. at 44; J.A. at 136-39. The emails, which are not part of the administrative record, do not help Tobey's cause. J.A. at 188-191. Bob Keiter was not a member of the Committee that decided Tobey's claim, and his comments in no way establish that the Committee's decision was improperly influenced by conflict of interest.

of interest so severe that his determinations were entitled to no deference. *Id.* at 142. The evidence of animosity was far more significant on the part of the decision-maker in *Janerio* than the stray emails to which Tobey points.

Furthermore, in *Janeiro*, the primary issue on appeal was what standard of review the district court should have applied to the benefits claim when evaluating the defendants' decision-making. *Id.* at 133. As the court explained, "[t]he standard varies, depending on whether there [is] a conflict of interest. *Id.* In this Circuit, post-*Glenn*, the standard of review does not vary. In fact, this Court has expressly rejected the use of a modified abuse of discretion standard. *See Champion*, 550 F.3d at 359. Thus, *Janeiro* is inapplicable.

> **e.      Given the substantial evidence supporting the conclusion that Tobey rescinded the 2009 Notice and the paltry evidence to the contrary, the conflict of interest factor cannot possibly serve as a "tiebreaker" in this case.**

Ultimately, the 100% reduction in Tobey's benefit due to his untimely notice was derived by a straight-forward application of the Plan terms, and the conclusion that Tobey had withdrawn the 2009 Notice was supported by copious direct and circumstantial evidence. Thus, even acknowledging (as did the Committee) that Tobey at times struggled to maintain positive social relationships with his partners and co-workers at Keiter, it was perfectly reasonable for the Committee and the District Court to have concluded that no animosity towards Tobey improperly

43

influenced the decision to deny his claim. As the District Court rightly found, *see* J.A. at 211-15, because the record evidence showing that Tobey <u>did</u> rescind the 2009 Notice "substantially outweighs" the evidence to the contrary, one cannot conclude that the Committee was unreasonably influence by any conflict. Thus, in light of all the circumstances reflected in the administrative record, the Court has no need to use "conflict of interest" as a "tiebreaker."

### C.    The District Court Did Not Err by Granting Summary Judgment to the Keiter Parties without Hearing Additional Evidence.

Although Tobey asserts that <u>his</u> motion for summary judgment could have been granted without additional evidence, he assigns error to the District Court's failure to take additional evidence on the conflict of interest factor before granting the Keiter Parties' summary judgment motion. Appellant's Br. at 53-54. Tobey's contention that an evidentiary hearing or a bench trial was necessary before the District Court could properly rule on the Keiter Parties' motion for summary judgment is inconsistent with the law of this Circuit for ERISA benefits cases.[7]

---

[7] Even under traditional Rule 56 standards, summary judgment for the Keiter Parties remains appropriate. Tobey contends that a genuine dispute of material fact existed between Hall and Tobey as to what actions took place in May 2009. Appellant's Br. at 54. However, Tobey has conceded that Keiter *believed* that Tobey had rescinded the 2009 Notice. J.A. at 135; 175-76. The central question-- whether Keiter believed that Tobey rescinded his notice--is not disputed. Tobey cannot now change his position in a last-ditch effort to convince the Court of some lingering dispute of material fact in order to avoid judgment.

44

As the District Court correctly held, in ERISA abuse-of-discretion cases, summary judgment motions are simply the conduit by which the issues are brought before the court. *See Keith v. Fed. Exp. Corp. Long Term Disability Plan*, 7:09-cv-389, 2010 WL 1524373, at n.4 (W.D. Va. Apr. 15, 2010) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999), *overruled on other grounds by Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006) (en banc)); *accord Malagrida v. Holland*, 19 F.3d 1429 (4th Cir. 1994) (upholding the district court's grant of summary judgment where a plan administrator resolved a disputed factual issue). It is not the role of the court to dig into the facts and the record before the plan administrator. *See Evans*, 514 F.3d at 321-23. Rather, the District Court reviews the plan administrator's decision from the perspective of an appellate court, reviewing the record to determine if it was reasonable. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788-89 (4th Cir. 1995).

As the District Court noted, "judgment turns on a determination of whether the plan administrator abused its discretion." J.A. at 204. Conducting a bench trial on a factual dispute that had been resolved by the Committee would be in derogation of the required deference. *Id.*; *see also Hilton v. UNUM Life Ins. Co. of Am.*, 967 F. Supp. 2d 1114, 1119 (E.D. Va. 2013) ("In an abuse of discretion standard of review, evidence to be considered by a district court is limited to the administrative record, which consists of the claim file and the plan documents.").

Indeed, courts in this Circuit routinely grant summary judgment even after determining that a conflict of interest exists. *See, e.g.*, *Hilton*, 967 F. Supp. 2d at 1126; *Koffman v. Unum Life Ins. Co. of Am.*, 2013 WL 3242350, at *8 (E.D. Va. June 24, 2013). Here, it was within the Committee's discretion to resolve the factual dispute regarding the withdrawal of the 2009 Notice. As the District Court explained, it would be improper for the court to review, de novo, that same factual dispute by way of a bench trial or evidentiary hearing. J.A. 204.

The District Court's decision to forgo an additional evidentiary hearing also fully comports with this Court's guidance on the consideration of evidence outside the administrative record where a conflict has been identified. *See Helton v. AT&T Inc.*, 709 F.3d 343, 356 (4th Cir. 2013) (holding that "a district court **may** consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when such evidence is necessary to adequately assess the *Booth* factors and the evidence was known to the plan administrator when it rendered its benefits determination") (emphasis added). While acknowledging that "[g]enerally, consideration of evidence outside of the administrative record is inappropriate when a coverage determination is reviewed for abuse of discretion[,]" this Court found that there was no "absolute bar" to considering evidence outside the administrative record. *Id.* at 352. The language used by the Court in *Helton* is permissive, not mandatory—the district court "may" consider

46

evidence outside of the administrative record (not "shall").  Here, the District Court's decision not to hear additional evidence on the conflict of interest factor is completely in line with *Helton*.

Tobey's contention that that the District Court erred by failing to hear additional evidence runs afoul of *Helton* and ignores the inherent discretion granted to district court judges in ruling on evidentiary issues.  This Court reviews a district court's "decision regarding the admission or exclusion of evidence for abuse of discretion."  *United States v. Morales*, 301 F. App'x 293, 295 (4th Cir. 2008).  "Such discretion is only abused when a district court has acted arbitrarily or irrationally."  *Id.* (internal quotation omitted).  In no way did the District Court act arbitrarily or irrationally in declining Tobey's invitation to conduct an evidentiary hearing on the conflict factor.

Tobey also cites to *Wicklander v. Defined Benefit Pension Plan of AGC-Int'l Union of Operating Engineers Local 701 Pension Trust Fund*, 2004 WL 2260609 (D. Or. Oct. 5, 2004) for the proposition that additional evidence regarding conflict of interest was necessary prior to granting judgment for the Keiter Parties. *Wicklander* is inapposite, however.  In *Wicklander*, the court concluded that because the plaintiffs alleged a conflict of interest, they should be allowed to obtain discovery of evidence outside the record.  *Id.* at *5.  In other words, the

47

plaintiffs in *Wicklander* had not yet conducted any discovery—a procedural posture quite different from this case.

In addition, the *Wicklander* decision cited by Tobey was followed by another opinion ruling on cross-motions for summary judgment. *Wicklander v. Defined Benefit Pension Plan of AGC-Int'l Union of Operating Engineers Local 701 Pension Trust Fund*, 2005 WL 1271633 (D. Or. May 25, 2005) ("*Wicklander II*"). In *Wicklander II*, the court found that even assuming that the plaintiff had established a conflict of interest in the form of personal animus, he had not provided evidence that the conflict caused the benefit decision. *Id.* at *3. The plaintiff's claim had been denied by a committee of at least two trustees, one of whom may have expressed some personal animus against the plaintiff. *Id.* However, the court found that there was no evidence "that any animus expressed by one Trustee influenced the other decision-making Trustee." *Id.* A similar statement could be made about the Committee that reviewed Tobey's claim.[8]

---

[8] Tobey cites to *Vaughan v. Celanese Americas Corp.*, 339 F. App'x 320 (4th Cir. 2009) for the notion that this Court had "not[ed] with approval" the district court's three-day hearing to determine the effect of a conflict of interest. Appellant's Br. at 54. However, the Court did not approve or disapprove of the lower court's hearing, it simply mentioned that it occurred. *Id.* at 328. Tobey also cites *Cargile v. Confederation Life Ins. Grp. Plans*, 748 F. Supp. 874 (N.D. Ga. 1990), a case decided under a different framework than that adopted in *Champion*. The court in *Cargile* found that the plan administrator had operated under a conflict of interest and thus, the burden shifted to the fiduciary "to prove that its interpretation of the plan provisions committed to its discretion was not tainted by self-interest."

## II. TOBEY'S STATE LAW CLAIMS CONCERNING HIS COMPENSATION AND SHAREHOLDER RIGHTS WERE PROPERLY DISMISSED.

### A. The District Court Lacked Subject Matter Jurisdiction Over Tobey's State Law Breach of Contract Claims Because They Do Not Arise Out of the Same Common Nucleus of Operative Fact as His Claim for Retirement Benefits Under ERISA.

As Tobey acknowledges, the controlling statute relevant to the supplemental jurisdiction inquiry is 28 U.S.C. § 1367. *ESAB Group, Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 394 (4th Cir. 2012) (stating that section 1367 "largely codified the doctrine of pendant jurisdiction (and the related doctrine of ancillary jurisdiction) as supplemental jurisdiction."). Tobey, however, mischaracterizes section 1367 as "a default rule that supplemental jurisdiction is appropriate[.]" Appellant's Br. at 56. To the contrary, section 1367(a) sets forth a threshold requirement that **must** be satisfied in order for the court to exercise jurisdiction in the first place. *See Allapattah Servs., Inc. v. Exxon Corp.*, 362 F.3d 739, 766 (11th Cir. 2004) (stating that "§ 1367 involves a threshold jurisdictional issue.").

In order to meet this threshold, Tobey's state law claims must "form part of the same case or controversy under Article III of the United States Constitution" as his federal ERISA claim. 28 U.S.C. § 1367(a). In *United Mine Workers v. Gibbs*, the Supreme Court articulated the test for determining whether claims form

---

*Cargile*, 748 F. Supp. at 877 (internal quotation omitted). Such burden shifting is foreclosed in this Circuit by *Glenn* and *Champion*.

part of the same constitutional case. 383 U.S. 715, 725 (1966). According *Gibbs*, the "state and federal claims must derive from a common nucleus of operative fact." *Id*.[9]

The only real connection that Tobey's state law claims have to his ERISA claim is that they all relate in some way to his employment with Keiter--which is not enough. *See, e.g.*, *Nicol v. Imagematrix, Inc.*, 767 F. Supp. 744, 747-48 (E.D. Va. 1991); *Mason v. Richmond Motor Co., Inc.*, 625 F. Supp. 883, 887 (E.D. Va. 1986). There is no other material factual overlap between the federal and state counts. Tobey's ERISA claim requires proof that the denial of his retirement benefits was an abuse of discretion, with a key issue being whether it was reasonable for the Committee to conclude that Tobey had rescinded the 2009 Notice. By contrast, Tobey's state-law claims respectively center around whether Keiter (a) paid him the appropriate salary under his employment agreements, (b) paid him appropriate bonuses in accordance with what Plaintiff describes as the firm's "regular bonus compensation practices," (c) improperly failed to include him in the firm's bonus pool in order to deny him an increase in his ownership

---

[9] Tobey implies that *White v. County of Newberry, S.C.*, 985 F.2d 168 (4th Cir. 1993) created a "relaxed standard" for evaluating supplemental jurisdiction. Appellant's Br. at 57. *White*, however, did not prescribe a new standard for the exercise of supplemental jurisdiction. Rather, as noted by the District Court, *White's* statement that "[t]he claims need only revolve around a central fact pattern[,]" is nothing more than a paraphrasing of the *Gibbs* requirement that the claims arise out of a "common nucleus of operative fact."

50

percentage as a shareholder, and (d) failed to appropriately redeem his stock. J.A. at 31-35. The evidence Tobey would have to muster, if he can, to support those claims is plainly different from that reviewed by the District Court in assessing Tobey's ERISA count. As the District Court noted, "the operative facts in the administrative record regarding Tobey's retirement notice are not the operative facts as to whether Keiter breached its obligations under Tobey's contract." J.A. at 95-96.[10] Thus, Tobey's state law counts fail the *Gibbs* test, and the District Court lacked supplemental jurisdiction over them.

While the Court need look no further than its own prior decisions to uphold the dismissal of Tobey's state law counts, a decision from the United States District Court for the Northern District of Illinois, *Berg v. BCS Fin. Corp.*, 372 F. Supp. 2d 1080 (N.D. Ill. 2005), is also instructive. In *Berg*, the plaintiff, a former executive of the defendant company and participant in its retirement plan, filed suit alleging that the defendants had violated ERISA by wrongfully denying benefits and by failing to comply with certain federal regulations. *Id.* at 1083. The plaintiff also asserted a breach of contract claim alleging that the company had failed to perform its obligations under his employment agreement. *Id.* The court granted

---

[10] In an effort to avoid this result, Tobey contends that his shareholder rights claim in Count IV is sufficiently connected to the ERISA claim because his ownership percentage in the firm effects the amount of his retirement benefit under the Plan. Appellant's Br. at 60. The Committee determined, however, due to his untimely notice, that Tobey is **entitled to no benefits whatsoever**. J.A. at 339-42. The issue addressed in Tobey's ERISA claim is his entitlement to benefits, *vel non*.

the defendants' motion to dismiss, holding that the plaintiff had failed to establish that there was supplemental subject matter jurisdiction over the state law count. *Id.* at 1092.

As the court in *Berg* explained, "the mere fact that claims arise from an employment relationship is, by itself, insufficient to warrant the exercise of supplemental jurisdiction." *Id.* at 1093. "Likewise, supplemental jurisdiction does not exist where the federal and state claims merely share a factual background." *Id.* Because the operative facts underlying the plaintiff's ERISA claims did not sufficiently relate to the breach of contract claim, the court found that those claims did not derive from a common nucleus of operative fact. *Id.* at 1095. As in *Berg*, the facts operative to whether Keiter breached agreements with Tobey to pay him the salary or bonuses he believes he is due, or to whether Keiter treated Tobey properly as a shareholder, are simply not the same as those operative on the subject of whether it was an abuse of discretion to deny Tobey's claim for retirement benefits. That the claims may share certain "background" facts or arise generally from Tobey's employment with Keiter is not sufficient to create jurisdiction.

Tobey relies heavily on the case of *Stewart v. W. Va. Employers' Mut. Ins. Co.*, 2007 WL 4300595 (S.D.W. Va. Dec. 5, 2007), to support his argument that the District Court lacked discretion to decline the exercise of supplemental jurisdiction. Appellant's Br. at 60-63. *Stewart* involved state law claims of breach

of contract, negligence, and fraud in the inducement, as well as a claim for denial of long-term disability benefits. *Id.* at *1. The plaintiff in *Stewart* had left her government job with the understanding that, as an employee of her new company, she would continue to receive long-term disability benefits and would not face any penalties for pre-existing conditions. *Id.* After the plaintiff became disabled, her claim for long-term disability benefits was denied on the basis of a pre-existing condition, contrary to what she had been promised. *Id.* The court found that the exercise of supplemental jurisdiction was proper pursuant to section 1367(a) and that the court lacked discretion to decline the exercise of supplemental jurisdiction. *Id.* at *3.

All of the plaintiff's claims in *Stewart* challenged the denial of her benefits, and all claims hinged on the alleged misrepresentation that the plaintiff would not be penalized for pre-existing conditions in obtaining benefits. *Id.* at *1. Unlike *Stewart*, the claims here do not share a "core of common facts." *Id.* at *2. Instead, the claims require different factual proof, are based on disparate types of evidence, and are reviewed under divergent legal standards. Tobey's reliance on *Stewart* is therefore misplaced.

53

**B.   Even if Supplemental Jurisdiction Did Exist Over Counts II-V, the District Court Reasonably Declined to Exercise Jurisdiction Over Them.**

Tobey also argues that, as in *Stewart*, that the District Court lacked discretion to decline the exercise of supplemental jurisdiction because none of the four factors in § 1367(c) have been met.   J.A. at 59.   As the District Court highlighted, however, Tobey's own contentions made clear that his state law claims would have predominated over his ERISA claim.   J.A. at 97 ("Tobey, himself, asserts that this case is really 'about the unlawful efforts of Keiter to "undo" its merger with Tobey.'").   The state law claims also would have required different standards of proof and substantive evidence.   *Id.*   Moreover, the state claims would have significantly expanded the scope of discovery.   *Id.*

The District Court thus correctly held that, even if Tobey had proven supplemental jurisdiction, it would have declined to exercise it.   Such decision was not an abuse of the District Court's discretion.   *See Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) ("[T]rial courts enjoy wide latitude in determining whether or not to retain jurisdiction over state claims[.]"); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) (stating that discretionary decisions to decline or exercise supplemental jurisdiction under section 1367(c) are reviewed for abuse of discretion).   Indeed, Tobey does not even contend that the District Court abused its discretion.    Rather, Tobey argues that adjudicating these claims in a single

54

proceeding and in a single forum would have been more convenient.[11]  Appellant's Br. at 63.  While that might be true, mere convenience cannot outweigh the fact that federal courts are courts of limited jurisdiction, and Tobey's state law claims were not properly before the District Court.

## **CONCLUSION**

The Keiter Parties respectfully request that this Court affirm the District Court's decisions to dismiss Tobey's state law claims and to grant summary judgment in their favor as to Tobey's ERISA claim and request that the Court award the Keiter Parties their costs and attorney fees incurred herein.

## **ORAL ARGUMENT STATEMENT**

The Keiter Parties request oral argument to provide further commentary on the issues presented on appeal.

---

[11] Tobey cites to *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988) in support of his contention that the District Court should have weighed the values of judicial economy, convenience, fairness and comity when deciding whether to exercise supplemental jurisdiction.  The *Carnegie-Mellon* opinion actually states that in cases in which "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendant jurisdiction doctrine –judicial economy, fairness, convenience, and comity—will point toward <u>declining</u> to exercise jurisdiction over the remaining state-law claims."  *Id.* at n.7 (emphasis added).

Respectfully submitted,

_____/s/ Andrew P. Sherrod_____

Andrew P. Sherrod
Jaime B. Wisegarver
HIRSCHLER FLEISCHER, P.C.
2100 East Cary Street
P.O. Box 500
Richmond, VA 23218
(804) 771-9575
asherrod@hf-law.com
jwisegarver@hf-law.com

*Counsel for Appellees*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
<u>Typeface Requirements and Type Style Requirements</u>

1.     This brief complies with the Type-volume limitation of Fed. R. App. 32(a)(7)(B) because:

The word count of this brief is <u>13,901 words</u>.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word, Times New Roman, 14 point.</u>

July 11th, 2014

_____/s/ Andrew P. Sherrod_____
*Counsel for Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of July, 2014, I caused the foregoing Response Brief of Appellees to be filed with the Clerk, U.S. Court of Appeals for the Fourth Circuit via hand delivery and electronically using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF user:

> Richard F. Hawkins, III
> HAWKINS LAW FIRM, P.C.
> 2222 Monument Avenue
> Richmond, VA 23220
> (804) 308-3040
> Rhawkins#thehawkinslawfirm.net

*Counsel for Appellant*

July 11, 2014

/s/ Andrew P. Sherrod<br>*Counsel for Appellee*

57